## RECORD NO. 15-1021

In The

# United States Court of Appeals

### For The Fourth Circuit

# CHESAPEAKE BAY ENTERPRISE, INC.,

*Defendant - Appellant,*

**v.**

# PILLSBURY WINTHROP SHAW PITTMAN LLP,

*Third Party Defendant – Appellee,*

and

## REGIONS BANK

*Third Party Defendant,*

## CHESAPEAKE TRUST

*Plaintiff.*

## ON APPEAL FROM THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF VIRGINIA
## AT RICHMOND

———————————

## BRIEF OF APPELLANT

———————————

**Steven S. Biss**
**ATTORNEY AT LAW**
**300 West Main Street, Suite 102**
**Charlottesville, Virginia 22903**
**(804) 501-8272**

*Counsel for Appellant*

UNITED STATES COURT OF APPEALS FOR THE FOURTH CIRCUIT
DISCLOSURE OF CORPORATE AFFILIATIONS AND OTHER INTERESTS

Disclosures must be filed on behalf of <u>all</u> parties to a civil, agency, bankruptcy or mandamus case, except that a disclosure statement is **not** required from the United States, from an indigent party, or from a state or local government in a pro se case.  In mandamus cases arising from a civil or bankruptcy action, all parties to the action in the district court are considered parties to the mandamus case.

Corporate defendants in a criminal or post-conviction case and corporate amici curiae are required to file disclosure statements.

If counsel is not a registered ECF filer and does not intend to file documents other than the required disclosure statement, counsel may file the disclosure statement in paper rather than electronic form.  Counsel has a continuing duty to update this information.

No. _____        Caption: _____

Pursuant to FRAP 26.1 and Local Rule 26.1,

_____

(name of party/amicus)

_____

 who is _____, makes the following disclosure:
(appellant/appellee/petitioner/respondent/amicus/intervenor)

1.      Is party/amicus a publicly held corporation or other publicly held entity?      YES      NO

2.      Does party/amicus have any parent corporations?                                    YES      NO
        If yes, identify all parent corporations, including grandparent and great-grandparent corporations:

3.      Is 10% or more of the stock of a party/amicus owned by a publicly held corporation or other publicly held entity?                                    YES      NO
        If yes, identify all such owners:

4.     Is there any other publicly held corporation or other publicly held entity that has a direct financial interest in the outcome of the litigation (Local Rule 26.1(b))?     YES     NO
       If yes, identify entity and nature of interest:

5.     Is party a trade association? (amici curiae do not complete this question)     YES     NO
       If yes, identify any publicly held member whose stock or equity value could be affected substantially by the outcome of the proceeding or whose claims the trade association is pursuing in a representative capacity, or state that there is no such member:

6.     Does this case arise out of a bankruptcy proceeding?     YES     NO
       If yes, identify any trustee and the members of any creditors' committee:

Signature: _____     Date: _____

Counsel for: _____

## CERTIFICATE OF SERVICE

**************************

I certify that on _____ the foregoing document was served on all parties or their counsel of record through the CM/ECF system if they are registered users or, if they are not, by serving a true and correct copy at the addresses listed below:

_____          _____
          (signature)                                              (date)

# TABLE OF CONTENTS

Page No.

Table of Authorities ………………………………………..    ii

Jurisdictional Statement …………………………………………    1

Statement of the Issues Presented for Review ……………………..    1

Statement of the Case and Relevant Facts ……………………………    2

Summary of the Argument ……………………………………    28

Argument …………………………………………………..    29

     CBE's Conversion Claim ………………………………    29

         Standard of Review ……………………………...    29

         The District Court Erred In Affirming The Decision
Of The Bankruptcy Court To Grant Summary
Judgment In Favor Of Pillsbury On CBE's Conversion
Claim ………………………………………………    31

     CBE's Breach of Fiduciary Duty Claim ……………………..    39

         Standard of Review …………………………………...    39

         The District Court Erred In Affirming The Decision
Of The Bankruptcy Court To Dismiss CBE's
Claim Of Breach Of Fiduciary Duty Under Rule
7012(b) [Fed.R.Civ.Proc. 12(b)(6)] …………………..    40

Conclusion and Request for Relief …………………………………    42

Certificate of Compliance

# TABLE OF AUTHORITIES

Page No.

*Allen Realty Corp. v. Holbert*,
    227 Va. 441, 318 S.E.2d 592 (1984) ……………………… 40

*Ashcroft v. Iqbal*,
    556 U.S. 662 (2009) ……………………………………….. 40

*Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242 (1986) …………… 30,31

*Bell Atl. Corp. v. Twombly*,
    550 U.S. 544 (2007) ……………………………………… 39

*Celotex Corp. v. Catrett*,
    477 U.S. 317 (1986) ……………………………………… 30,31

*Cline v. Wal–Mart Stores, Inc.*,
    144 F.3d 294 (4th Cir.1998) ………………………………… 30

*Condominium Services, Inc. v.*
    *First Owners' Association of*
    *Forty Six Hundred Condominium, Inc.*,
    281 Va. 561, 709 S.E.2d 163 (2011) ……………………… passim

*Conley v. Gibson*,
    355 U.S. 41 (1957) ……………………………………… 39

*Cook v. John Hancock Life Ins. Co. (USA)*,
    2015 WL 178108 (W.D. Va. 2015) …………………………. 32,33

*Dunn Construction Co. c. Cloney*,
    278 Va. 260, 682 S.E.2d 943 (2009) ……………………….. 32

*EEOC v. Navy Fed. Credit Union*,
    424 F.3d 397 (4th Cir. 2005) ……………………………….. 30

<u>Page No.</u>

*Flippo v. CSC Associates III, LLC*,
      262 Va. 48 (2001) …………………………………………….    42

*Gordon v. Pete's Auto Serv. Of Denbigh*,
      838 F.Supp.2d 436 (E.D. Va. 2012) …………………………    36

*Harrell v. Colonial Holdings, Inc.*,
      2013 WL 550424 (E.D. Va. 2013) …………………………...    39

*Haynes v. Glenn*,
      197 Va. 746, 91 S.E.2d 433 (1956) …………………………    35

*H-B Ltd. Partnership v. Wimmer*,
      220 Va. 176, 257 S.E.2d 770 (1979) ………………………..    40

*In re Derivium Capital, LLC*,
      716 F.3d 355 (4th Cir. 2013) ………………………………...    29

*In re Hartford Sands Inc.*,
      372 F.3d 637 (4th Cir. 2004) ………………………………….    29

*Jones v. Bank of America Corp.*,
      2010 WL 6605789 (E.D. Va. 2010) …………………………    33,34

*LBCMT 2007-C3W Broad Street , LLC v.*
      *WSG Development Co.*,
      2013 WL 1897128 (E.D. Va. 2013) …………………………    33

*Metropolitan Life Ins. Co. v. Hunter*,
      2013 WL 2156326 (E.D. Va. 2013) …………………………    37

*Mitrano v. Melka*, 2009 WL 3734189 (E.D. Va. 2009) …………...    29

*Morissette v. United States*,
      342 U.S. 246 (1952) ………………………………………….    36

Page No.

*Oertel v. Ransone*,
    1997 WL 33120364 (Fairfax Cir. 1997) ........................ 15

*Overstreet Ky. Cent. Life Ins. Co.*,
    950 F.2d 931 (4th Cir. 1991) ..................................... 31

*Owen v. Shelton*,
    221 Va. 1051, 277 S.E.2d 189 (1981) .......................... 40

*Pace Airlines, LLC v. Professional Settlement Services, LLC*,
    2010 WL 480977 (N.D. Ohio 2010) ........................... 26,35

*PGI, Inc. v. Rathe Prods., Inc.*,
    265 Va. 334, 576 S.E.2d 438 (2003) ............................ 32

*Quick Serve Concepts, LLC v. Cedar Fair, L.P.*,
    2011 WL 8947571 (Hanover Cir. 2011) ........................ 34

*Republican Party of N.C. v. Martin*,
    980 F.2d 943 (4th Cir. 1992) ..................................... 39

*RitLabs, S.R.L. v. RitLabs, Inc.*,
    2012 WL 6021328 (E.D. Va. 2012) ........................... 41

*Russell v. Microdyne Corp.*,
    65 F.3d 1229 (4th Cir. 1995) ..................................... 31

*Schlegel v. Bank of America*,
    271 Va. 542, 628 S.E.2d 362 (2006) ............................ 37

*Sedler v. Select Properties, Inc.*,
    2004 WL 3392897 (Loudoun Cir. 2004) ....................... 40

*Simmons v. Miller*,
    261 Va. 561, 544 S.E.2d 666 (2001) ............................ 35

Page No.

*Sosebee v. Murphy*,
    797 F.2d 179 (4th Cir. 1986) ………………………………    31

*Straley v. Fisher*,
    176 Va. 163, 10 S.E.2d 551 (1940) …………………………    35

*Three Rivers Landing of Gulfport, L.P. v.*
    *Three Rivers Landing, LLC*,
    2013 WL 5492936 (W.D. Va. 2013) ………………………...    36

*T.G. Slater & Son, Inc. v.*
    *Donald P. and Patricia A. Brenna, LLC*,
    385 F.3d 836 (4th Cir. 2004) ………………………………..    39

*United Leasing Corporation v. Thrift Ins. Corp.*,
    247 Va. 299, 440 S.E.2d 902 (1994) ………………………...    32

*United Rentals, Inc. v. Angell*,
    592 F.3d 525 (4th Cir. 2010) ………………………………..    30

*Universal C.I.T. Credit Corp. v. Kaplan*,
    198 Va. 67, 92 S.E.2d 359 (1956) ……………………………    32

*Williams v. Griffin*,
    952 F.2d 820 (4th Cir. 1991) ………………………………    31

28 U.S.C. § 157 ……………………………………………    1

28 U.S.C. § 158(a)(1) ………………………………………..    1

28 U.S.C. § 158(a)(3) ………………………………………..    29

28 U.S.C. § 158(c)(1) ………………………………………..    1

28 U.S.C. § 158(d) ………………………………………...    1

Rule 3 of the Federal Rules of Appellate Procedure ………………    1

Page No.

Rule 4 of the Federal Rules of Appellate Procedure ……………… 1

Rule 6 of the Federal Rules of Appellate Procedure ……………… 1

Rule 7012(b) of the Federal Rules of Bankruptcy Procedure ……. 28,29,40,42

Rule 7041 of the Federal Rule of Bankruptcy Procedure ………… 18

Rule 7056 of the Federal Rules of Bankruptcy Procedure ……….. 5,30

Rule 8013 of the Federal Rules of Bankruptcy Procedure ………… 29

Fed.R.Civ.Proc. 12(b)(6) ……………………………………… passim

Fed.R.Civ.Proc. 56 ……………………………………………… 3,30,31,34

## <u>JURISDICTIONAL STATEMENT</u>[1]

The basis of the District Court's subject matter and appellate jurisdiction is 28 U.S.C. § 158(a)(1) and (c)(1) (final judgments of bankruptcy judges in cases referred to the bankruptcy judges under 28 U.S.C. § 157).

The basis for the Court of Appeals' jurisdiction is 28 U.S.C. § 158(d) (final decisions entered under subsection (a) of § 158).

Appellant, Chesapeake Bay Enterprises, Inc. ("CBE"), appeals from a final decision entered by the United States District Court for the Eastern District of Virginia on November 25, 2014 affirming the decision of the United States Bankruptcy Court. [*JA VI, p. 2994*].  On December 23, 2014, CBE timely filed notice of appeal to the United States Court of Appeals for the Fourth Circuit pursuant to Title 28 U.S.C. §§ 158(d) and Rules 3, 4 and 6 of the Federal Rules of Appellate Procedure. [*JA VI, pp. 2995-2998*].

## <u>STATEMENT OF THE ISSUES PRESENTED FOR REVIEW</u>

CBE presents the following issues for review:

1.     Was CBE entitled to immediate possession of its $500,000 "at the Outside Date" under the Asset Purchase Agreement ("APA"), where no Closing or Buyer Default Termination had occurred?

---

[1]     Appellant's Opening Brief will refer to the Joint Appendix as "*JA*" and the Volume (*i.e., I, II, III, IV, V or VI*) and page numbers of the Joint Appendix. *E.g., "JA I, p. 1"*.

2.     Was CBE entitled to immediate possession of its $500,000 on November 13, 2012, after McGuire Woods - CBE's legal counsel - lawfully terminated the APA?

3.     Did the District Court properly find that CBE did not have a right to immediate possession and that Pillsbury was entitled to summary judgment as a matter of law on CBE's claim of conversion?

4.     Did the District Court properly find that there was no plausible evidence in the record of any breach of fiduciary duty by Pillsbury?

## STATEMENT OF THE CASE AND RELEVANT FACTS

This Appeal involves third-party common-law intentional tort claims asserted by CBE against Appellee, Pillsbury Winthrop Shaw Pittman LLP ("Pillsbury") for conversion of $500,000 in identifiable funds and for Pillsbury's breach of fiduciary duties as an escrow agent for CBE.

On April 9, 2013, the Chesapeake Trust commenced this action by filing a one-count adversary complaint against CBE for breach of contract. In its complaint, the Trust alleged that CBE breached a certain Asset Purchase Agreement entered into by and between CBE and Debtor, Potomac Supply Corporation ("Potomac"). [*JA III, pp. 1362-1463*].[2]

---

[2]     The breach of contract claims between the Trust and CBE were tried on September 11, 2014, and are not the subject of this Appeal.

On April 23, 2013, CBE filed an answer and affirmative defenses to the adversary complaint [*JA III, pp. 1464-1479*], and a third-party complaint against Pillsbury and others. [*JA III, pp. 148-1505*]. CBE's third-party complaint alleges, *inter alia*, Virginia common law claims of conversion and breach of fiduciary duty.[3] Pillsbury filed a motion to dismiss CBE's conversion and breach of fiduciary duty claims or, in the alternative, for summary judgment. [*JA IV, pp. 1661-1664*]. CBE opposed Pillsbury's motion. [*JA IV, pp. 1761-1844*].

By Order entered July 29, 2013, the Bankruptcy Court granted summary judgment as to CBE's conversion claim and dismissed CBE's claim of breach of fiduciary duty pursuant to Rule 12(b)(6). The Bankruptcy Court granted leave until August 14, 2013 for CBE to replead its claims. [*JA I, p. 26 – Docket Entries 75 and 77*].

On August 14, 2013, CBE filed a first amended third-party complaint, again alleging common-law intentional tort claims against Pillsbury for conversion and breach of fiduciary duty. [*JA IV, pp. 1857-1938*].

On October 11, 2013, Pillsbury moved pursuant to Rules 12 and 56 of the Federal Rules of Civil Procedure to dismiss CBE's claims of conversion and

---

[3]     CBE also filed a motion to withdraw reference of the adversary case to the Bankruptcy Court. The District Court denied CBE's motion to withdraw by Order entered January 17, 2014. [*JA V, pp. 2453-2463*].

breach of fiduciary duty or, in the alternative, for summary judgment. [*JA IV, pp. 2015-2023*; *JA V, pp. 2024-2327*].

CBE opposed Pillsbury's motion with affidavit and other documentary evidence. [*JA V, pp. 2328-2452*].

On February 28, 2014 and March 3, 2014, CBE moved for partial summary judgment against Pillsbury on its claims of conversion and breach of fiduciary duty. [*JA V, pp. 2464-2536*; *JA VI 2537-2593*].

Pillsbury opposed CBE's motion for partial summary judgment. [*JA VI, pp. 2610-2813*].

By Order entered April 24, 2014, the Bankruptcy Court granted Pillsbury's motion for summary judgment and dismissed CBE's conversion and breach of fiduciary duty claims with prejudice. [*JA VI, pp. 2956-2980*].  In its Memorandum Opinion, the Bankruptcy Court found that "CBE's conversion claim fails because it lacks the right to immediate possession of the [$500,000] Deposit." [*JA VI, p. 2972*]  The Court found that Pillsbury had not breach fiduciary duties to CBE because "Pillsbury is holding the Deposit in its trust account subject to a Court determination of its rightful owner." [*JA VI, p. 2976*].

CBE timely appealed to the District Court [*JA VI, pp. 2981-2984*].

By Order entered November 25, 2014, the District affirmed the decision of the Bankruptcy Court. *JA VI, pp. 2985-2994*].

CBE timely appealed to the Court of Appeals. [*JA VI, pp. 2995-2998*].

## Facts Relevant To The Issues Submitted For Review[4]

**A.    *Potomac***

Potomac Supply Corporation ("Potomac") was founded in 1948 by Mr. and Mrs. Robert C. Carden in the small fishing village of Kinsale, located in the historic Northern Neck peninsula of Virginia.  Potomac remains a closely held Virginia corporation, with its current shareholders and board members all being the children and grandchildren of the founders.  Potomac began as a modest toy and fish-box company and grew into a sawmill and building supply company in the 1950's, adding pallet manufacturing in the 1960's, wood preservation in the 1970's, home specialty-product manufacturing in the 1980's, and woody biomass processing (as an alternative source of home heating energy) in 2009.  Potomac

---

[4]    The following facts are alleged by CBE in its first amended third-party complaint ("FATPC") [*JA IV, pp. 1857-1938*] with citations to the underlying record in the main Bankruptcy Case No. 12-30347-BFK.  The facts alleged are taken directly from pleadings signed and filed by Pillsbury in the main Bankruptcy Case.  The pleadings constitute judicial admissions, which may be considered by the Court under either Rule 7012 and/or Rule 7056 of the Federal Rules of Bankruptcy Procedure.  All representations of fact and statements made by Pillsbury in pleadings filed with the United States Bankruptcy Court are presumed to be truthful and accurate, except where it is demonstrated that Pillsbury made false statements. *See infra*.  The Declaration of Philip J. Haynie, II ("Haynie Declaration") [*JA IV, pp. 2374-2422, 2426-2429*], submitted by CBE in opposition to Pillsbury's motion to dismiss and/or for summary judgment pursuant to Rule 7056, restates and incorporates many of the relevant facts stated in the FATPC. For ease of reference, Appellant's Statement of the Facts will refer to the FATPC and the Haynie Declaration and the specific paragraphs therein.

rapidly became the largest employer in the Northern Neck, with more than 350 employees at its peak. *FATPC, ¶ 12.*

On November 17, 2009, Potomac and Regions Bank ("Regions") entered into certain loans, including a $15,000,000 term loan, a $25,000,000 revolving loan, and a $3,000,000 "capex" loan/line of credit. As of January 20, 2012, the total amount due on all three facilities was approximately $17,344,159. In 2010, Regions informed Potomac that it was outside the loan covenants. Regions demanded immediate repayment or the bank would call the loans. Regions agreed to renew the loans if Potomac agreed to sell certain timber land to a Regions subsidiary. Although Potomac sold the timber and paid Regions approximately $5,000,000.00, Regions did not renew Potomac's loans, which caused catastrophic issues for Potomac and for Potomac's trade creditors. Regions told Potomac to look for other banking sources. Potomac was unable to secure a new lender. Regions then insisted that Potomac completely liquidate its operations. Prior to the business difficulties brought on in part by Regions' actions, Potomac had never missed a payment on its credit facilities, and had never failed to pay its trade vendors. *FATPC, ¶ 13.*

On January 20, 2012, as a result of the financial difficulties caused by Regions and unwilling to quit on its 63 year-old business and the employees and

local community it served, Potomac commenced a Chapter 11 bankruptcy case. *FATPC, ¶ 14*.

Potomac retained Pillsbury as its bankruptcy counsel. *FATPC, ¶ 15*.

Pillsbury performed legal services for Potomac that are not at issue in this case. Whether Pillsbury committed legal malpractice in its representation of Potomac is not at issue in this case. **Independent of and apart from its role as attorney** for Potomac, Pillsbury knowingly, voluntarily and intentionally undertook to provide business services to both CBE and Potomac. It is these business services that are at issue in this case. *FATPC, ¶ 16-17*.

On March 2, 2012, Regions filed a motion for conversion, dismissal, or in the alternative, for appointment of a liquidating trustee or relief from the automatic stay ("Motion to Convert"). After several months of litigation and hearings relating to Regions' Motion to Convert, Potomac, Regions, and the Official Committee of Unsecured Creditors (the "Committee") decided to work cooperatively in an effort to sell Potomac's working assets "and to avoid the distraction and expense of further litigation relating to the pending Motion to Convert."

On July 27, 2012, Pillsbury filed a "Motion for Orders Approving (A) Auction Procedures, (B) the Sale of Substantially All of the Debtor's Assets Free and Clear of All Liens, Claims, Interests and Encumbrances, and (C) Notice of

Auction and Auction Procedures" ("Auction Procedures Motion"). *FATPC, ¶ 18.*

In the Auction Procedures Motion, Pillsbury confirmed that:

> "On May 4, 2012, the Court entered an order authorizing Potomac to engage and retain Morgan Joseph TriArtisan LLC ("Morgan Joseph") as investment banker.  Since Morgan Joseph's retention, Potomac has been diligently working with Morgan Joseph to market the Assets.  Specifically, Morgan Joseph has prepared marketing materials, assembled a data room and contacted a number of potential purchasers and investors.  Although discussions are ongoing with several parties, *Potomac wishes to establish certain procedures for the sale of the Assets to bring the marketing process to conclusion*.

(Emphasis added).  Pillsbury represented that

> "Potomac believes it is in the best interest of its estate, creditors, customers and employees to commence auction procedures immediately, as Potomac has limited resources with which to maximize the value of its assets. Further, Potomac and Morgan Joseph have been extensively marketing the Assets for some time and believe the Auction Procedures will help expedite the sale process and facilitate the making of offers … Potomac is proposing the sale and the Auction Procedures with the goal of expediting the sale process and facilitating the making of offers, and only after having undertaken an extensive marketing process with Morgan Joseph.

*FATPC, ¶ 18; JA II, pp. 547-548 (Auction Procedures Motion, ¶¶ 25-26).*

On August 16, 2012, the Bankruptcy Court entered an Order granting Pillsbury's Auction Procedures Motion, and authorizing Potomac to conduct an auction process with respect to all or any portion of its assets, with the goal of selling substantially all of its assets free and clear of liens, claims, interests and encumbrances (the "Auction Procedures Order"). *FATPC, ¶ 18.*

The assets to be sold included that certain industrial and manufacturing facility located at 1398 Kinsale Road, Kinsale, Virginia (the "Plant"), which consisted of 159 acres and 690,000 square feet of buildings and improvements, together with accounts receivable, inventory, intangibles, equipment and all other material assets located at the Plant (collectively, the "Assets"). *FATPC, ¶ 18*.

Pillsbury published Notice of Approval of Auction Procedures for the Sale of Substantially All of the Debtor's Assets (the "Notice of Approval"). The Auction was scheduled for September 19, 2012 at Pillsbury's offices in Washington, D.C. Pillsbury prepared a form asset purchase agreement between Potomac and the prevailing bidder at the Auction. The due date for bids from "Qualified Bidders" was September 17, 2012. To be eligible to be a Qualified Bidder, bidders were required, *inter alia*, to make a deposit (the "Deposit") for the potential acquisition of the Assets. In its summary of the Auction Procedures, Pillsbury represented that the Deposit (in an amount equal to 10% of the initial bid) would be:

> "held as a deposit by Debtor's Counsel (it being understood that the Deposit may also be sent by wire transfer of immediately available funds to Debtors' Counsel), together with written authorization for Potomac to use the Deposit as liquidated damages if the bidder providing the Deposit becomes the winning bidder at the Sale hearing and fails to close the transaction."

Pillsbury further represented in its Notice of Approval that:

9

"**<u>The Deposit shall be refundable</u>** if the bidder's asset purchase agreement is not approved by the Court."

*FATPC, ¶ 18 (emphasis added).*

Between August 2012 and September 19, 2012, Potomac solicited and received six (6) bid proposals for its assets. While certain interested parties appeared at Pillsbury's offices on September 19, 2012 to bid on the Assets, an Auction (according to its plain meaning), did not occur. Instead, the priority of the pre-Auction bids was established on the record. No party increased its bid. Pillsbury and Regions believed that "all the pre-Auction bids were woefully inadequate." On September 20, 2012, Pillsbury filed a First Auction Supplement, in which it represented that during the process conducted by Potomac on September 19, 2012, "by consent of Potomac, Regions Bank and the Unsecured Creditors Committee, the process was adjourned without date, though subject to adequate notice to all creditors and parties in interest." *FATPC, ¶ 19.*

B.    ***Chesapeake Bay Enterprises***

On April 5, 2012, CBE engaged McGuire Woods' Richmond, Virginia Office (John H. Maddock, III, Esquire) ("McGuire Woods" or "Maddock") to represent it in connection with a potential purchase of Potomac's assets and/or Potomac's debt (loans) with Regions. Between April 2012 and September 2012, CBE and Potomac negotiated an arm's length asset purchase agreement. CBE secured private financing from Great Eastern Investment Fund, LLC ("Great

Eastern"), and was ready, willing, and able to purchase the assets of Potomac. As of September 11, 2012, CBE had sufficient funds available to consummate the contemplated purchase of Potomac's assets. *FATPC, ¶ 20.*

On September 17, 2012, Pillsbury attorney, Jerry Lane Hall ("Hall") emailed Maddock. In his email, Hall emphasized that it was "critical" that CBE forward both an asset purchase agreement and a deposit ahead of the meeting of interested parties at Pillsbury's office, which (as noted above) was scheduled for September 19, 2012. Hall urged Maddock to advise CBE to "send[] the wire right away". Hall represented that "[w]ithout the wire and APA" from CBE, he would have a "very uphill battle in the face of the incoming bids, all of which are being supported by cash deposits. To make the case for halting the auction, the Haynies [CBE] have to show that they are as serious as the bidders." Hall represented to Maddock that one bidder, Universal Forest Products, had sent a wire to Pillsbury on September 17, 2012 in the amount of $500,000. The beneficiary of the Universal Forest Products' wire transfer was "Pillsbury Winthrop Shaw Pittman LLP – in Trust for *Potomac Supply Corporation*". *FATPC, ¶ 21 (emphasis added).*

Initially, on September 13, 2012, Pillsbury provided a draft wire instruction form to McGuire Woods, that did not identify the "Beneficiary" or other pertinent information. The September 13, 2012 wire instruction form reads as follows:

**Beneficiary:**        (Pillsbury Winthrop Shaw Pittman LLP – in Trust for *Client Name*)

**Other Information:**    (*Attorney Name & Client/Matter Number*)

*FATPC, ¶ 23*.  Between September 13, 2012 and September 17, 2012 – prior to a penny ever being transferred to Pillsbury – the wire instructions were completed to expressly designate the "Beneficiary".   The completed wire instructions actually read:

**Beneficiary:**        (Pillsbury Winthrop Shaw Pittman LLP – in Trust for *Chesapeake Bay Enterprises*)

**Other Information:**    ((*Jerry Hall*) *Bid on Potomac Supply Corporation*)

The agreed-upon wire instructions represented and affirmed to CBE that the express beneficiary of the CBE wire transfer was "**Pillsbury Winthrop Shaw Pittman LLP – in Trust for <u>Chesapeake Bay Enterprises</u>**". (Emphasis in original). *FATPC, ¶ 24*.

On September 17, 2012 and September 18, 2012, CBE wired a total of $500,000.00 in identifiable funds to Pillsbury.   As expressly stated on the wire transfer requests and confirmations, the funds were wired to Pillsbury "in trust" for CBE. *FATPC, ¶ 25*.

Hall received the wire transfer confirmations.   Pillsbury knew, at least by September 18, 2012, that the funds had been wired in trust for CBE. *FATPC, ¶ 26*.

Pillsbury accepted the wire transfers and the trust for CBE without reservation, qualification, objection, or question of any kind. *FATPC, ¶ 27*.

Pillsbury agreed to hold the money in trust for CBE. *FATPC, ¶ 28.* The money or property was entrusted to Pillsbury as agent for a particular purpose – the purchase of Potomac's assets – and for no other purpose. The money was impressed by the law with a trust in favor of the principal (CBE) until the money had been devoted to such purpose. *FATPC, ¶ 29.*

In accepting CBE's funds and agreeing to hold the funds in trust, Pillsbury was acting as a *de facto* escrow agent for CBE. **Pillsbury was not acting as an attorney**. *FATPC, ¶ 30.*

Pillsbury held (and continues to retain) CBE's funds in its trust account. Pillsbury's trust account, in which CBE's funds were transferred, is not an interest-bearing account. *FATPC, ¶ 32.*

## C.     *The Asset Purchase Agreement ("APA")*

On or about September 21, 2012, CBE and Potomac signed a written Asset Purchase Agreement ("APA"). [*JA III, pp. 1030-1062*]. The APA was a joint product of McGuire Woods (on behalf of CBE) and Pillsbury (on behalf of Potomac). *APA, § 11.18.* Pursuant to the terms and conditions of the APA, CBE agreed to buy certain assets related to the business of Potomac for $20,338,000 (subject to a working capital adjustment). *APA, § 2.1*; *FATPC, ¶ 33.*

Section § 2.1.2 of the APA called for the "deposit into escrow with an escrow agent (the "Deposit Escrow Holder") mutually agreed on by Seller and

Buyer $500,000 … pursuant to an escrow agreement to be executed by Seller, Buyer and the Deposit Escrow Holder". No Deposit Escrow Holder was ever designated and no escrow agreement was ever executed. In addition, the APA required the "Deposit Escrow Holder" to "immediately deposit" the $500,000 "into an interest-bearing account". CBE's $500,000 was never deposited into an interest-bearing account. Instead, Pillsbury retained possession of CBE's $500,000 in its trust account. *FATPC, ¶ 34*.

Section 2.1.2 of the APA expressly stated that:

> "The Deposit Escrow Holder shall return to Buyer [CBE] the Deposit (and any interest accrued thereon) … at the Outside Date, … and no Closing or Buyer Default Termination has occurred as of such date … The Deposit Escrow Holder shall deliver the Deposit (and any interest accrued thereon) to Seller [Potomac] upon the earlier of (A) Seller's termination of this Agreement under Section 4.3.2 as a result of the failure of a condition to Seller's obligations set forth in Section 4.1.1 (a "Buyer Default Termination"), or (B) the Closing."

No Buyer Default Termination was ever issued by the Seller (Potomac) and the "Closing" did not occur prior to the "Outside Date" – the date certain specified in § 3.2 of the APA for when Closing had to occur. *See, e.g., APA § 3.2* ("The Closing shall be held within two (2) business days after both of the following conditions have been satisfied (the "Closing Date") … but in no event shall the Closing take place forty five (45) days after the Effective Date (the "Outside Date")).[5]

---

[5]    The "Outside Date" was November 5, 2012 - forty five (45) days after the Effective Date of the APA.

The APA contains no forfeiture clause.   Issuance of a Buyer Default Termination was a condition precedent to Seller's right to keep CBE's $500,000 Deposit. *See, e.g., Oertel v. Ransone*, 1997 WL 33120364 * 1 (Fairfax Cir. 1997) ("Oertel's contention that the Defendant's breach made useless his terminating the contract is without merit.  Under Virginia law, unless contrary to public policy, the contract, itself, provides the framework for legal analysis … Generally, there exists a presumption that parties have not used words needlessly … While the Plaintiff argues that no one should be required by law to do a useless act, it is the Plaintiff who imposed the burden upon himself to terminate for failure to perform prior to invoking the terms of Article 15.1.  In as much as he was bound to render performance on the Contract as a whole, he was bound by this provision as well. Thus, terminating the Contract as a condition precedent to seeking recovery of sums paid out in draws cannot fairly be interpreted as a useless act.") (many citations omitted).   Absent a Buyer Default Termination, § 2.1.2 of the APA clearly, expressly and unambiguously requires the Deposit to be "return[ed] to Buyer" – CBE – "at the Outside Date" if "no Closing or Buyer Default Termination has occurred as of such date".  The Outside Date – November 5, 2012 – was never extended.  To reiterate, no Closing or Buyer Default Termination ever occurred.

1.     ***Conditions Precedent and Express Obligations***

In addition to § 2.1.2, the APA contained express conditions precedent to Buyer's (CBE) obligations, *APA § 4.2*, and imposed express affirmative obligations on Seller (Potomac) prior to Closing. *APA § 8*.

Among the express conditions precedent to CBE's obligation to close were the requirements (a) that the Bankruptcy Court enter an "Approval Order", which, *inter alia*, approves the sale to CBE on the terms and conditions set forth in the APA, *APA § 4.2.4*, (b) the "Auction Procedures Motion" "shall be fully and completely withdrawn and no longer subject to consideration by the Bankruptcy Court, (c) the "Auction Procedures Order" "shall be fully and completely vacated and of no further force or effect". *APA, §§ 4.2.4, 4.2.5, 4.2.6*.

Section 8.3 of the APA obligated the "Seller" to file a motion with the Bankruptcy Court (the "Sale Motion") within five (5) days of the "Execution Date" requesting entry of an Approval Order.  Following the filing of the Sale Motion, Seller owed a duty to "use its commercially reasonable efforts to obtain entry of the Approval Order."  Both Potomac and CBE's obligations to consummate the transaction were "conditioned on the Bankruptcy Court's entry of the Approval Order." *APA, § 8.3*.  Section 8.8 of the APA obligates "Seller" to "take any and all actions necessary to "withdraw its … Auction Procedures Motion … **and** … vacate … the []Auction Procedures Order". (Emphasis added). *FATPC, ¶ 35*.

Time was of the essence in the performance of *all* conditions and obligations in the APA. *APA, § 11.20*; *FATPC, ¶ 36*.

Any and all waivers or modifications of the terms and conditions of the APA had to be in writing, and signed "by the party making the waiver." *APA, § 11.10*; *id., § 11.5*.

## 2. *Closing*

The Closing of the transaction was to be held "within two (2) business days after" "(i) each condition to closing set forth in Section 4 has either been satisfied or waived; and (ii) each of the conditions precedent to lending set forth in that certain commitment letter of Great Eastern Investment Fund, LLC, dated September 11, 2012, and in the definitive financing documents related thereto, shall have been satisfied or waived",[6] but "in no event" could Closing take place "forty five (45) days after the Effective Date (the 'Outside Date')". *APA, § 3.2*. The APA provides that "[u]ntil this Agreement is terminated or the parties have agreed upon an extended Closing Date, the parties shall diligently continue to work to satisfy all conditions to Closing." *APA, § 3.2*; *FATPC, ¶ 37*.

---

[6]    The "definitive financing documents" identified as part of the conditions in § 3.2 of the APA were never drafted and the terms and conditions of those documents were never agreed upon by Great Eastern and CBE.

### 3.     *Seller (Potomac) Materially Breached the APA*

On September 24, 2012, in an attempt to comply with Potomac's material obligations in § 8.8 of the APA, Pillsbury filed a "Notice of Withdrawal" of the Auction Procedures Motion pursuant to Rule 7041 of the Federal Rule of Bankruptcy Procedure. *FATPC, ¶ 38*.

In its Notice of Withdrawal, Pillsbury represented to the Court that "[n]o objection to the Motion is pending." This was a false statement. In fact, prior to September 24, 2012, Pillsbury knew that one or more Objections to the Auction Procedures Motion had actually been filed. Pillsbury could not proceed under Rule 7041 [41(a)(1)(A)(i)] because of these Objections. Pillsbury needed Bankruptcy Court approval to withdraw the Auction Procedures Motion, which it *never* sought or obtained. *FATPC, ¶ 38*.

Potomac filed no motion with the Bankruptcy Court and made no effort to "fully and completely" withdraw the Auction Procedures Motion, such that it was "no longer subject to consideration by the Bankruptcy Court." *APA, § 4.2.5*; *FATPC, ¶ 39*.[7]

---

[7]     Rule 7041 addresses the dismissal of adversary proceedings. Rule 7041 incorporates Rule 41 of the Federal Rules of Civil Procedure, which authorizes dismissal by the Plaintiff without a Court Order before an opposing part files an answer or a motion for summary judgment. *Rule 41(a)(1)(A)(i)*. Dismissal under Rule 41(a)(1)(A) is also "without prejudice". *Rule 41(a)(1)(B)*.

On September 28, 2012, Regions and the Official Committee of Unsecured Creditors (the "Committee") filed a Joint Objection to Pillsbury's "purported Notice of Withdrawal". Regions and the Committee advised the Bankruptcy Court that "[t]he Debtor's unilateral attempt to halt a sale process coordinated with the Creditors violates an order of this Court as well as applicable bankruptcy law and should be denied." The Joint Objection expressly and emphatically highlighted Pillsbury's failures:

> "The Creditors object to the Debtor's attempted withdrawal of the Motion on the grounds that (a) the Auction Order approving the relief requested in the Motion prohibits the Debtor from attempting to modify the Auction Procedures without the consent of Regions and the Committee, and (b) pursuant to Rule 41(a) of the Federal Rules of Civil Procedure (the "**Rules**"), made applicable to this contested matter by Rules 7041 and 9041 of the Federal Rules of Bankruptcy Procedure (the "**Bankruptcy Rules**"), the movant cannot withdraw the contested matter without approval of all parties who have appeared."

In spite of Regions and the Committee's Joint Objection, Pillsbury did nothing to cure the deficiencies in its Notice of Withdrawal. *FATPC, ¶ 40*.

There was another major problem as well. Although the APA (§ 8.8(ii)) expressly required Potomac (Seller) to take "any and all actions necessary" to vacate the Auction Procedures Order on or before September 26, 2012, Potomac (Pillsbury) took absolutely *no* action and *never* requested the Bankruptcy Court to vacate the Auction Procedures Order. *FATPC, ¶ 41*.

On September 26, 2012, Pillsbury filed in Bankruptcy Court the Sale Motion required by § 8.3 of the APA.  On October 2, 2012, Cellco Partnership (d/b/a Verizon Wireless) filed an Objection to Pillsbury's Sale Motion.  Cellco's Objection was never resolved. *FATPC, ¶ 43.*

### 4.    *The Regions Subpoena*

On September 26, 2012, Regions Bank caused a broad-ranging Subpoena to be issued and served on the registered agent of CBE, demanding that CBE appear for a deposition within five (5) days and produce a virtually unlimited number of documents at the law office of LeClair Ryan.  Pillsbury (Hall) considered the Regions' Subpoena to be "contrived and more like a strategy to increase expenses needlessly, harass Potomac and Chesapeake and scuttle the transaction the debtor has selected as the best ad highest."  Hall threatened to "hold the bank … accountable for any negative consequences they cause."  Pillsbury (Potter) warned that the Regions' Subpoena was an "aggressive" move calculated to "impede and prevent a 20+ million dollar deal from being done". *FATPC, ¶ 44.*

CBE gave a copy of the Regions' Subpoena to its private lender, Great Eastern.  On September 27, 2012, CBE was notified by a representative of Great Eastern, Mathew Kovce, that Great Eastern was "not going to mess with this longer than a nano-second.  As it stands now, there is no commitment and until Manny Singh, our attorney confirms to me in writing that there will be no

20

involvement by Great Eastern either directly, indirectly or even by smoke signals in the litigation, this matter is at an end." *FATPC, ¶ 45*.

On October 2, 2012, Maddock notified Hall that Regions' Subpoena had caused Great Eastern to cease all work on CBE's loan and that Great Eastern would "no longer work towards closing the loan transaction." Because the APA is expressly conditioned on funding from Great Eastern, *APA, ¶ 3.2*, Maddock asked Hall to withdraw Potomac's motion for an order approving the sale to CBE. Maddock also demanded the return of CBE's $500,000. *FATPC, ¶ 46*.

Potomac did ***not*** withdraw its Sale Motion, ***or*** terminate the APA, ***or*** serve notice of default of any kind on CBE, as a result of its receipt of Maddock's October 2, 2012 letter. Instead, between October 2, 2012 and November 6, 2012, Potomac and CBE diligently continued to work to satisfy all conditions to Closing. In good faith, CBE requested extensions of time to make the second $500,000 deposit called for in § 2.1.2 of the APA. Pillsbury drafted an amendment to the APA, which Potomac and CBE signed on October 5, 2012, extending the deadline set forth in § 2.1.2(ii) through and including Wednesday, October 10, 2012. Potomac granted a further extension of time to Friday, October 12, 2012. *FATPC, ¶¶ 47-48*.

Between October 12, 2012 and October 24, 2012, CBE obtained funding to replace Great Eastern. On October 12, 2012, Maddock forwarded a commitment

21

letter from Plan D Investments, LLC, and requested a further extension of the time to make a second $500,000 deposit under the APA.  Potomac did not grant a third extension.  Significantly, Potomac ***still*** did not terminate the APA or serve any notice of default or Buyer Default Termination of any kind on CBE, as a result of CBE's failure to pay a second $500,000 by October 12, 2012.  Rather, on October 17, 2012, October 29, 2012, and November 6, 2012, Pillsbury requested the Bankruptcy Court to continue the hearing on the Sale Motion. *FATPC, ¶ 49.* Pillsbury never brought the Sale Motion on for hearing. *FATPC, ¶ 50.*  Pillsbury never withdrew the Sale Motion. *FATPC, ¶ 50.*[8]

### 5.    ***Sale to AIP***

While the APA was in full force and the Sale Motion to approve a sale to CBE was pending, Pillsbury voluntarily pursued and consummated a sale of Potomac's assets to Potomac Supply, LLC, a subsidiary or affiliate of American Industrial Products ("AIP"), for approximately $10,000,000.  Unbeknownst to both the Bankruptcy Court and CBE, Pillsbury began to work on the AIP Asset Purchase Agreement on or before October 15, 2012.  By October 19, 2012, the "AIP APA" was already completed.  Hall spent 0.4 Hours reviewing the document.

---

[8]     In spite of the fact that the Sale Motion was pending, Pillsbury began to think about how to retain CBE's $500,000 that Pillsbury still held "in trust" for CBE.  On October 19, 2012, Hall did 4.60 ***Hours*** of "Analysis and research" on the "Chesapeake deposit", including a half hour conference with Potter "regarding same". *FATPC, ¶ 50 fn 12.*

Potomac received a $1,000,000 deposit from AIP, which, upon information and belief, was delivered to Pillsbury. *FATPC, ¶ 51.*

By November 6, 2012, the assets of Potomac were sold to AIP. At a Bankruptcy Court hearing on November 6, 2012, Pillsbury made an oral motion to withdraw its September 24, 2012 Notice of Withdrawal of its Auction Procedures Motion, which the Bankruptcy Court granted. Without any reservation of rights, Pillsbury affirmatively requested the Bankruptcy Court to approve the sale to AIP. The Court granted Pillsbury's oral motion, and entered a Sale Order on November 13, 2012. *FATPC, ¶ 52.*

The sale of Potomac's assets to AIP rendered performance of the CBE/Potomac APA legally impossible, and effectively terminated the APA. In spite of the sale of Potomac's assets to AIP, Pillsbury continued (and continues to this day) to retain possession of CBE's $500,000. Pillsbury unlawfully saw the $500,000 in trust money as a source of payment of Pillsbury's enormous legal fees from "non-estate property". In fact, Pillsbury believed that CBE's $500,000 was the "only avenue of repayment" of its legal fees, as is clearly stated in an email from Hall to counsel for Regions. Pillsbury had no lawful right or claim to CBE's funds, let alone the right to take the $500,000 to pay legal fees. *FATPC, ¶ 53.*

On November 8, 2012, Pillsbury and Regions filed an Agreed Motion to Settle Superpriority Administrative Claim of Regions Bank and Approve

Distribution of Sale Proceeds and submitted an agreed Order.  At an expedited

hearing on November 13, 2012, the Bankruptcy Court entered an Order granting

the Agreed Motion (the "Settlement Order").[9]  In pertinent part, the Settlement

Order provides:

> "…
>
> 5.    **Distribution of Proceeds of Chesapeake Deposit.**
> Pillsbury shall be assigned all right, title and interest of the Debtor to  one or
> more deposits tendered to the Debtor by Chesapeake, totaling $500,000.00
> (the "**Chesapeake Deposit**"), subject to the following:
>
> a.    Pillsbury shall be entitled to any recovery to the extent
> of its reasonable fees and expenses incurred in prosecuting and/or defending
> litigation to recover and/or retain the Chesapeake Deposit (the "**Pillsbury-
> Chesapeake Fees**").
>
> b.    After recovery of the Pillsbury-Chesapeake Fees,
> Pillsbury shall be entitled to any recovery on account of the Chesapeake
> Deposit up to $240,000.00.

*FATPC, ¶ 54.*

## D.    *Termination of the APA by CBE*

Section 4.3 of the APA provided the terms and conditions under which

either or both parties could terminate the APA.

---

[9]    On November 12, 2012, McGuire Woods filed a Reservation of
Rights in opposition to the Agreed Motion, pursuant to which CBE reserved all of
its rights with regard to the $500,000 deposit provided by CBE to Pillsbury
pursuant to the APA. *FATPC, ¶ 54 fn 15.*

Section 4.3.4 of the Purchase Agreement provided that "[e]ither Seller or Buyer may terminate this Agreement by written notice to the other party(ies) pursuant to Section 11.7." Section 11.7 provides that if Buyer cannot acquire and Seller cannot sell substantially all of the Business Property and the Non-Business Property, then either party may terminate this Agreement, and it shall be of no further force and effect, unless both parties agree in writing to the contrary." *FATPC, ¶ 56.*

Section 4.4.1 of the APA, entitled "<u>Consequences of Termination</u>", clearly states as follows:

> "If this Agreement is terminated under Sections … 4.3.3, 4.3.4, 4.3.5 … then all rights and obligations of the parties hereunder shall terminate without any liability of any party to any other party; *provided, however*, that Section 2.1.2 relating to return of the Deposit shall survive such termination, and with respect to a termination under (i) Section … Buyer shall instruct the Deposit Escrow Holder to deliver the Deposit to Buyer, together with all interest accrued thereon."

Upon lawful termination, the APA is "of no further force and effect". *APA, § 11.7*; *FATPC, ¶ 57.*

On November 13, 2012, McGuire Woods terminated the APA pursuant to §§ 4.3 and 11.7 and, for a second time, demanded the return of CBE's $500,000, still being held in trust by Pillsbury for CBE. *FATPC, ¶ 58.*

CBE never rescinded the November 13, 2012 Termination Letter. *FATPC, ¶ 59.*

In spite of the passage of the "Outside Date" with "no Closing or Buyer Default Termination as of such date", in spite of CBE's termination of the APA, in spite of the sale of Potomac's assets to AIP, and in spite of CBE's demand for the immediate return of its property, Pillsbury intentionally and without lawful justification of any kind refused to return the $500,000 it was (and is) holding in trust for CBE. *FATPC, ¶ 60* (*See, e.g., Condominium Services, Inc. v. First Owners' Association of Forty Six Hundred Condominium, Inc.*, 281 Va. 561, 573-575, 709 S.E.2d 163 (2011) ("According to FOA [plaintiff], CSI's [defendant's] conversion of FOA's funds was distinct from the Management Agreement because it occurred after FOA properly terminated the Management Agreement. FOA contends that summary judgment on its conversion claim was appropriate because FOA presented undisputed evidence that CSI took $91,125 of FOA assessment money after being terminated as FOA's management agent. We agree with FOA … Because the Management Agreement had terminated, CSI's alleged acts did constitute the "independent, willful tort" of conversion, separate from the contract. The circuit court did not err in denying CSI's motion to strike FOA's conversion claim."); *id. Pace Airlines, LLC v. Professional Settlement Services, LLC*, 2010 WL 480977 * 10-11 (N.D. Ohio 2010) ("There is no doubt that PSS converted the Deposit when it failed to return it to Pace upon Pace's demand.").

F.    ___The "Chesapeake Trust"___

In January 2013, Pillsbury decided to create a "litigation trust" and to transfer "legal rights against Chesapeake Bay Enterprises" to that trust.   The "litigation trust" was "necessary", as counsel for Regions explained in an email, in order for Pillsbury and Regions to gain "access to that company's [CBE's] purchase deposit" as part of Pillsbury's "payment scheme". *FATPC, ¶ 67.*

On January 24, 2013, the Bankruptcy Court entered a Consent Order on Motion to Convert Potomac's bankruptcy to a Chapter 7 liquidation.  In pertinent part, the Consent Order provided as follows:

> "8.    To ensure that the provisions of the Settlement Order are honored, all right, title and interest in and to any cause of action, claim or defense relating to funds held and owned by Pillsbury (as provided in  the Settlement Order) against Chesapeake Bay Enterprise, Inc. or any person claiming ownership of or an interest in such funds shall be placed in a trust over which Pillsbury shall be trustee".

To avoid any misunderstanding, the Bankruptcy Court emphasized that all causes of action, claims or defenses transferred to the Trust were "not and shall not be deemed property of the estate (and shall be deemed contributed to the Trust  upon entry of this Order and signing of the Trust Agreement by Pillsbury)". *FATPC, ¶ 68.*

## SUMMARY OF THE ARGUMENT

The Bankruptcy Court erred in granting summary judgment on CBE's conversion claim against Pillsbury and erred in dismissing CBE's breach of fiduciary duty claim under Rule 7012(b) [incorporating Fed.R.Civ.Proc. 12(b)(6)]. The District Court erred in affirming the Bankruptcy Court.  For the following reasons, the District Court's decision should be reversed and summary judgment should be entered in favor of CBE on its claims of conversion and breach of fiduciary duty against Pillsbury:

1.      After November 5, 2012 – the "Outside Date" – CBE was entitled to immediate possession of its $500,000 because "no Closing or Buyer Default Termination" had occurred as of "such date", and, under § 2.1.2 of the APA, CBE was immediately entitled to the return of its $500,000.

2.      After November 13, 2012 and the sale of Potomac's Assets to AIP, CBE was entitled to immediate possession of its $500,000 because McGuire Woods properly terminated the APA, such that the APA was "of no further force and effect".

3.      There was, at a minimum, a genuine issue of fact as to whether CBE was entitled to immediate possession of its $500,000, such that the District Court and the Bankruptcy Court erred in granting summary judgment as a matter of law.

4.     CBE clearly stated a claim of breach of fiduciary duty by Pillsbury upon which relief can be granted, such that the District Court and the Bankruptcy Court erred is dismissing CBE's claim under Rule 7012(b) [Fed.R.Civ.Proc. 12(b)(6)].

# ARGUMENT

## A.   *CBE'S CONVERSION CLAIM*

### 1.   *Standard of Review*

On appeal, a District Court "may affirm, modify, or reverse a bankruptcy judge's judgment, order, or decree or remand with instructions for further proceedings." *Fed.R.Bankr.Proc. 8013*; *see* 28 U.S.C. § 158(a)(3).  The District Court "review[s] the bankruptcy court's legal conclusions *de novo* and its factual findings for clear error." *In re Hartford Sands Inc.,* 372 F.3d 637, 639 (4th Cir. 2004); *Mitrano v. Melka*, 2009 WL 3734189 * 2 (E.D. Va. 2009) ("A bankruptcy court's conclusions of law are reviewed *de novo*.") (citations omitted).

In an appeal from a bankruptcy proceeding, the Court of Appeals applies the same standard of review that the District Court applied to the bankruptcy court's decision. *In re Derivium Capital, LLC*, 716 F.3d 355, 360 (4th Cir. 2013) (citations omitted).  Thus, the Court reviews legal conclusions *de novo* and factual findings for clear error.  Summary judgment is appropriate when "there is no genuine

dispute as to any material fact and the movant is entitled to judgment as a matter of law." *Id.* (quoting Fed.R.Civ.P. 56(a)).

Summary judgment in bankruptcy is governed by Federal Rule of Bankruptcy Procedure 7056, which incorporates the standards of Federal Rule of Civil Procedure 56 into bankruptcy proceedings. *United Rentals, Inc. v. Angell,* 592 F.3d 525, 530 (4th Cir. 2010). Thus, the Court must view the facts and the reasonable inferences drawn therefrom in the light most favorable to the nonmoving party. *Id.* (citing *EEOC v. Navy Fed. Credit Union,* 424 F.3d 397, 405 (4th Cir. 2005)). Summary judgment is only appropriate if there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. *Id.* (quoting *Cline v. Wal–Mart Stores, Inc.,* 144 F.3d 294, 300 (4th Cir.1998)).

Material facts are those necessary to establish the elements of a party's cause of action. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A genuine issue of material fact exists if, in viewing the record and all reasonable inferences drawn therefrom in a light most favorable to the non-moving party, a reasonable fact-finder could return a verdict for the non-movant. *Id.* The moving party has the burden of showing – "that is, pointing out to the district court – that there is an absence of evidence to support the nonmoving party's case." *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986). If the movant satisfies this burden, then the

non-movant must set forth specific, admissible facts that demonstrate the existence of a genuine issue of fact for trial. *Fed. R. Civ. P. 56(c)*; *Celotex*, 477 U.S. at 322-323.  A party is entitled to summary judgment if – and only if – the record as a whole could not lead a rational trier of fact to find in favor of the non-movant. *Williams v. Griffin*, 952 F.2d 820, 823 (4th Cir. 1991).  Conversely, summary judgment is inappropriate if the evidence is sufficient for a reasonable fact-finder to return a verdict in favor of the non-moving party. *Anderson*, 477 U.S. at 248.

Even if there is no dispute as to the evidentiary facts, summary judgment is not appropriate where the ultimate factual conclusions to be drawn are in dispute. *Overstreet Ky. Cent. Life Ins. Co.*, 950 F.2d 931, 937 (4th Cir. 1991).  A court may not resolve disputed facts, weigh the evidence, or make determinations of credibility. *Russell v. Microdyne Corp.*, 65 F.3d 1229, 1239 (4th Cir. 1995); *Sosebee v. Murphy*, 797 F.2d 179, 182 (4th Cir. 1986).  "[A]t the summary judgment stage the judge's function is not himself to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." *Anderson*, 477 U.S. at 249.

**2.**     ***The District Court Erred In Affirming The Decision Of The Bankruptcy Court To Grant Summary Judgment In Favor Of Pillsbury on CBE's Conversion Claim***

Conversion is the wrongful exercise or assumption of authority, personally or by procurement, over another person's property, depriving such other person of

possession.  An act of dominion wrongfully exerted over property in denial of the owner's right, or inconsistent with it, amounts to a conversion.  Conversion occurs when a person exercises control over another's property without authorization from the rightful owner to do so. *United Leasing Corporation v. Thrift Ins. Corp.*, 247 Va. 299, 305, 440 S.E.2d 902 (1994); *Universal C.I.T. Credit Corp. v. Kaplan*, 198 Va. 67, 75-76, 92 S.E.2d 359 (1956) ("Any distinct act of dominion wrongfully exerted over the property of another, and in denial of his rights, or inconsistent therewith, may be treated as a conversion.").[10]

"A cause of action for conversion lies independent of an action in contract and may provide a separate basis, distinct from the contract upon which one [party] may sue another." *PGI, Inc. v. Rathe Prods., Inc.*, 265 Va. 334, 344, 576 S.E.2d 438 (2003) (affirming Jury verdict for compensatory and punitive damages, where conversion of settlement proceeds occurred "[u]pon completion" of the parties' joint venture and after the plaintiff made demand for its portion of the proceeds – "Upon the evidence presented, the jury was entitled to find that Rathe without justification wrongfully withheld settlement proceeds from PGI. None of the elements to sustain a cause of action for conversion are missing."); *see Cook v.*

---

[10]    To recover for the tort of conversion, "the duty tortiously or negligently breached must be a common law duty, not one existing between the parties solely by virtue of the contract." *Condominium Services, Inc. v. First Owners' Association of Forty Six Hundred Condominium, Inc.*, 281 Va. 561, 574, 709 S.E.2d 163 (2011) (quoting *Dunn Construction Co. c. Cloney*, 278 Va. 260, 267. 682 S.E.2d 943 (2009) (internal quotation marks omitted)).

*John Hancock Life Ins. Co. (USA)*, 2015 WL 178108 * 20 (W.D. Va. 2015) ("Virginia courts routinely have held that the duty not to convert others' property is a common law duty owed by all, and would exist even in the absence of a contract between the parties.") (citations omitted); *LBCMT 2007-C3W Broad Street , LLC v. WSG Development Co.*, 2013 WL 1897128 ** 3-4 (E.D. Va. 2013) ("When WSG pocketed the rent payments for the various projects, it committed the tort of conversion against the Lenders. Contrary to the defendant's assertions, disputes of material fact do not exist as to WSG's liability for conversion … Despite the requirements of the loan documents and the demand letters from the plaintiffs, the Borrowers did not remit rent payments to the plaintiffs. Instead, the Borrowers transmitted all "surplus cash" from the properties – the rent payments minus operating expenses – to WSG, at WSG's direction … In short, WSG wrongfully asserted dominion over money due to the plaintiffs, which was inconsistent with the plaintiffs' interest.") (applying Florida law); *Jones v. Bank of America Corp.*, 2010 WL 6605789 * 4 (E.D. Va. 2010) ("in this case, Jones may bring a claim for conversion despite the contractual relationship she has with Defendants if she alleges facts that demonstrate that she has a plausible claim for conversion.").

In this action, the evidence demonstrates that Pillsbury converted CBE's $500,000 ***after*** the "Outside Date" had passed under the APA (with "no Closing or Buyer Default Termination" having occurred "as of such date"), ***after*** McGuire

Woods lawfully terminated the APA, and certainly ***after*** Potomac's assets were sold to AIP. CBE's evidence demonstrates that the conversion occurred ***after*** CBE became lawfully entitled to immediate possession of the $500,000 under § 2.1.2 of the APA and certainly ***after*** the APA was lawfully terminated. By at least November 13, 2012, CBE had a right to immediate possession of its funds. Pillsbury had no right under the APA to withhold possession of CBE's funds.[11] *Compare Jones*, 2010 WL 6605789 at * 6 ("Jones does not have a right to the immediate possession of the funds held in escrow because she has a contractual obligation to pay those amounts unless and until she provides Defendants with proof that she paid them directly to the third party … Because Jones failed to plead a plausible claim that she has the right to immediate possession of the escrow funds, she failed to state a claim for conversion.") *with Quick Serve Concepts, LLC v. Cedar Fair, L.P.*, 2011 WL 8947571 * 2-3 (Hanover Cir. 2011) (affirming jury verdict on plaintiff's conversion claim, where defendant withheld possession of plaintiff's kiosk "pursuant to the 2004–2005 Concession Agreement" upon a claim that plaintiffs owed "$37,491.52 in revenue shortfalls.").

There is no question whatsoever that CBE has stated a claim of conversion, including a claim for punitive damages. *See, e.g., Condominium Services, Inc.*, 281

---

[11]    In accordance with Fed.R.Civ.Proc. 56(c), CBE's position is supported by citation to particular parts of the record, including § 2.1.2 of the APA, and CBE further supports its claim with the Affidavit of Philip Haynie.

Va. at 573-575, 709 S.E.2d at 171 ("According to FOA [plaintiff], CSI's [defendant's] conversion of FOA's funds was distinct from the Management Agreement because it occurred ***after*** FOA properly terminated the Management Agreement. [Emphasis added]. FOA contends that summary judgment on its conversion claim was appropriate because FOA presented undisputed evidence that CSI took $91,125 of FOA assessment money after being terminated as FOA's management agent. We agree with FOA … Because the Management Agreement had terminated, CSI's alleged acts did constitute the "independent, willful tort" of conversion, separate from the contract. The circuit court did not err in denying CSI's motion to strike FOA's conversion claim."); *Simmons v. Miller*, 261 Va. 561, 582, 544 S.E.2d 666 (2001) (there was ample evidence to support the Jury's verdict against a corporate officer and director for conversion, where the officer and director deprived the corporation of the use and value of its property including "the lease of office space, furniture, equipment, cash and customer lists"); *id. Pace Airlines, LLC v. Professional Settlement Services, LLC*, 2010 WL 480977 * 10-11 (N.D. Ohio 2010) ("There is no doubt that PSS converted the Deposit when it failed to return it to Pace upon Pace's demand.").[12]

---

[12]    The proper measure of damages for conversion is the value of the property converted at the time and place of the conversion. *Haynes v. Glenn*, 197 Va. 746, 753, 91 S.E.2d 433 (1956); *Straley v. Fisher*, 176 Va. 163, 167, 10 S.E.2d 551 (1940).

Since Pillsbury's conversion occurred after the "Outside Date" (with "no Closing or Buyer Default Termination having occurred as of such date) and after termination of the APA, *Condominium Services* is directly on point. In *Three Rivers Landing of Gulfport, L.P. v. Three Rivers Landing, LLC*, 2013 WL 5492936 (W.D. Va. 2013), the District Court rejected the argument that a defendant's "good-faith belief that he had authority … to take the funds constitutes sufficient 'mitigation' to send the conversion claim to trial. While it may explain why Kinser [the defendant] did what he did, it does not undercut the conversion claim because a defendant's belief that he had a right to the property is no defense to conversion. That is, "one may be held liable in conversion even though he reasonably supposed that he had a legal right to the property in question." 2013 WL 5492936 at * 5 (quoting *Morissette v. United States*, 342 U.S. 246, 270 fn. 31 (1952)). In *Morissette,* the Supreme Court explained the rationale for this rule:

> "[In the tort of conversion,] the defendant's knowledge, intent, motive, mistake, and good faith are generally irrelevant. If one takes property which turns out to belong to another, his innocent intent will not shield him from making restitution or indemnity, for his well-meaning may not be allowed to deprive another of his own."

*Id.* at * 6; *see also Gordon v. Pete's Auto Serv. Of Denbigh*, 838 F.Supp.2d 436, 440-441 (E.D. Va. 2012) (applying Virginia law and citing same principle). In *Three Rivers*, the District Court granted summary judgment to the plaintiff on its conversion claim, even though there was a dispute under an "Agreement" over

whether the money was due.  The District Court held that "even if the Developer might have been entitled to a portion of the monies at some later date, it was not yet entitled to the money at the time of the transfers; consequently, that portion was not yet the Developer's money.  Therefore, the elements of Plaintiffs' conversion claim, have been established insofar as liability is concerned." 2013 WL 5492936 at * 7; *see id. Metropolitan Life Ins. Co. v. Hunter*, 2013 WL 2156326 ** 4-5 (E.D. Va. 2013) (defendant's retention of insurance proceeds, after receiving written notification that the proceeds needed to be repaid, constitutes conversion).

In *Schlegel v. Bank of America*, the Supreme Court of Virginia **reversed** a state circuit court, ruling that the Bank of America's continued possession of the plaintiff's funds was unlawful and that the plaintiff had stated a common law conversion claim. 271 Va. 542, 554-555, 628 S.E.2d 362 (2006) ("Schlegel asserted that the Bank wrongfully exercised dominion and control over Piedmont's funds when the Bank froze the funds instead of returning them after learning that the payment orders were not authorized.  According to Schlegel, that dominion and control over the funds continued when the Bank refused to disburse the frozen funds after Schlegel and Grieb resolved their differences about ownership of Piedmont and the transferred funds.  The Bank nevertheless contends that, pursuant to its deposit agreement with Piedmont, it had the authority to freeze the funds at issue because of the dispute between Schlegel and Grieb.  Regardless of whether

the Bank is correct, no provision of Title 8.4A covers the second, independent transaction by the Bank and Schlegel's common law claims for conversion and breach of contract arising from that transaction … [F]reezing of the funds in Grieb's account instead of returning the funds to Piedmont's account is not a situation covered by any of the particular provisions of Title 8.4A … Thus, contrary to the circuit court's finding, we conclude that Schlegel's common law claims in this regard do not " fall squarely within the confines" of Code § 8.4A-204 or any other provision of Title 8.4A.  These specific common law claims are not preempted, and the circuit court erred in finding otherwise.").

The District Court erred in affirming the decision of the Bankruptcy Court to grant summary judgment to Pillsbury.  The District Court's decision should be reversed.

CBE filed a motion for partial summary judgment and supplemental motion[*JA V, pp. 2464-2536*; *JA VI, pp. 2537-2589*], asserting, on the same facts, that it was entitled to judgment as a matter of law.  The Court of Appeals should grant CBE's motion, and enter summary judgment in favor of CBE in the sum of $500,000 with interest from November 6, 2012 – the day the funds were converted (the day *after* the "Outside Date").

**B.**   ***CBE'S BREACH OF FIDUCIARY DUTY CLAIM***

    **1.**   ***Standard of Review***

"A motion to dismiss under Rule 12(b)(6) tests the sufficiency of a complaint; importantly, it does not resolve contests surrounding the facts, the merits of a claim, or the applicability of defenses." *Harrell v. Colonial Holdings, Inc.*, 2013 WL 550424 * 3 (E.D. Va. 2013) (quoting *Republican Party of N.C. v. Martin*, 980 F.2d 943, 952 (4th Cir. 1992)).  The Federal Rules of Civil Procedure "require[] only 'a short and plain statement of the claim showing that the pleader is entitled to relief,' in order to 'give the defendant fair notice of what the ... claim is and the grounds upon which it rests.'" *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007) (quoting *Conley v. Gibson*, 355 U.S. 41, 47 (1957).  A complaint need not assert "detailed factual allegations," but must contain "more than labels and conclusions" or a "formulaic recitation of the elements of a cause of action." *Twombly*, 550 U.S. at 555 (citations omitted).  Thus, the "[f]actual allegations must be enough to raise a right to relief above the speculative level, " *id.* (citation omitted), to one that is "plausible on its face," *id.* at 570, rather than merely "conceivable." *Id.*  In considering a motion to dismiss, a plaintiff's well-pleaded allegations are taken as true and the complaint is viewed in the light most favorable to the plaintiff. *See, e.g., T.G. Slater & Son, Inc. v. Donald P. and Patricia A. Brenna, LLC*, 385 F.3d 836, 841 (4th Cir. 2004) (citation omitted).   Legal

conclusions enjoy no such deference. *See, e.g., Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).

**2.      *The District Court Erred In Affirming The Decision Of The Bankruptcy Court To Dismiss CBE's Claim Of Breach Of Fiduciary Duty Under Rule 7012(b) [Fed.R.Civ.Proc. 12(b)(6)]***

"A fiduciary relationship exists in all cases when special confidence has been reposed in one who in equity and good conscience is bound to act in good faith and with due regard for the interests of the one reposing the confidence." *H-B Ltd. Partnership v. Wimmer*, 220 Va. 176, 179, 257 S.E.2d 770 (1979) (quoted in *Allen Realty Corp. v. Holbert*, 227 Va. 441, 446-447, 318 S.E.2d 592 (1984) ("Incident to the relationship, the fiduciary must tell his principal about anything "which might affect the principal's decision whether or how to act.") (quoting *Owen v. Shelton*, 221 Va. 1051, 1054, 277 S.E.2d 189 (1981)).

In this case, CBE expressly states in its first amended complaint that Pillsbury received $500,000 by wire from CBE that Pillsbury agreed to hold "**in trust for <u>Chesapeake Bay Enterprises</u>**". [*FATPC, ¶ 24 (emphasis in original)*]. CBE imposed special confidence in Pillsbury to hold the $500,000 in trust for CBE. CBE states that Pillsbury accepted that custodial trust and CBE's funds without reservation or qualification of any kind. *See, e.g., Sedler v. Select Properties, Inc.*, 2004 WL 3392897 * 2, 4 (Loudoun Cir. 2004) ("The duties imposed on the escrow agent under the Contract places a special confidence in the

Defendant binding it to act in good faith with respect to the deposit. Clearly, the Defendant had a duty under the Contract to hold and apply the deposit as required by the Contract. If a person receives money not his own to hold and distribute as required by an agreement or by law, then that person is a fiduciary. It is no different than the duty imposed upon an executor or a trustee. The mere fact of holding someone else's money with a specific duty to apply it creates the fiduciary relationship … I do not agree that the escrow agent's liability should be limited to the amount of the deposit, $5,000.00. This is not a case where the escrow agent lost or squandered the deposit or failed to pay over or account for the deposit. Here the escrow agent failed to act in good faith as required by a fiduciary.").

CBE has sufficiently alleged that there was a fiduciary relationship between it and Pillsbury relating to the $500,000 in Pillsbury's trust account that Pillsbury breached when it refused to return the $500,000 after the "Outside Date" passed on November 5, 2012 and after McGuire Woods demanded return of the funds on November 13, 2012. CBE expressly alleges that Pillsbury acted surreptitiously to further its own self-interest in being paid from the $500,000. *See, e.g. FATPC, ¶ 50 fn 10*. CBE's allegations are sufficient to state a claim upon which relief, including punitive damages, may be granted. *RitLabs, S.R.L. v. RitLabs, Inc.*, 2012 WL 6021328 * 7 (E.D. Va. 2012) ("Under Virginia law, a plaintiff may receive punitive damages, in addition to compensatory damages, for a breach of fiduciary

41

duty. *See Flippo v. CSC Associates III, LLC*, 262 Va. 48 (2001) (awarding both).")). The District Court erred in affirming the decision of the Bankruptcy Court to dismiss CBE's claim of breach of fiduciary duty under Rule 7012(b) [Fed.R.Civ.Proc. 12(b)(6)].

## **CONCLUSION AND REQUEST FOR RELIEF**

For the reasons stated above, the Court of Appeals should reverse the District Court's order entered November 25, 2014, enter summary judgment in favor of CBE on its motion for partial summary judgment, and remand the case to the Bankruptcy Court for Trial by Jury on CBE's claims for punitive damages against Pillsbury.

DATED:    March 5, 2015

Respectfully Submitted,

CHESAPEAKE BAY ENTERPRISES INC.

By:  */s/Steven S. Biss*
        Steven S. Biss (VSB # 32972)
        300 West Main Street, Suite 102
        Charlottesville, Virginia 22903
        Telephone:  (804) 501-8272
        Facsimile:     (202) 318-4098
        Email:        stevenbiss@earthlink.net

        *Counsel for Appellant, CBE*

## <u>CERTIFICATE OF COMPLIANCE</u>

1.    This brief complies with the type-volume limitation of Fed. R. App. P. 28.1(e)(2) or 32(a)(7)(B) because:

[ X ] this brief contains [*9,936*] words, excluding the parts of the brief exempted by Fed. R. App. P. 32(a)(7)(B)(iii), *or*

[      ] this brief uses a monospaced typeface and contains [*state the number of*] lines of text, excluding the parts of the brief exempted by Fed. R. App. P. 32(a)(7)(B)(iii).

2.    This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because:

[ X ] this brief has been prepared in a proportionally spaced typeface using [*Microsoft Word 2007*] in [*14pt Times New Roman*]; *or*

[      ] this brief has been prepared in a monospaced typeface using [*state name and version of word processing program*] with [*state number of characters per inch and name of type style*].

Dated: March 6, 2015                          */s/ Steven S. Biss*
                                                            *Counsel for Appellant*

## <u>CERTIFICATE OF FILING AND SERVICE</u>

I hereby certify that on this 5th day of March, 2015, I caused this Brief of Appellant and Joint Appendix to be filed electronically with the Clerk of the Court using the CM/ECF System, which will send notice of such filing to the following registered CM/ECF users:

> Jack McKay
> Patrick J. Potter
> PILLSBURY WINTHROP SHAW PITTMAN LLP
> 1200 17th Street, NW
> Washington, DC  20036
> (202) 663-8928
>
> *Counsel for Appellee*

I further certify that on this 6th day of March, 2015, I caused the required copies of the Brief of Appellant and Joint Appendix to be hand filed with the Clerk of the Court.

/s/ Steven S. Biss
*Counsel for Appellant*
